Good morning, Daniel P. Hanlon appearing for the petitioner Connie Fung. This case arises from a appeal of a final order of removal entered by the Board of Immigration Appeals against Ms. Fung based on their conclusion that she abandoned her lawful permanent resident status or green card due to an extended absence outside of the country and an evaluation of certain factors that were showed her intent to abandon her residence. This court should review the BIA's decision de novo. I'm sorry, the BIA reviewed the decision of the judge de novo. This court should review the BIA's decision. There is some confusion over the difference between the standard of review in this case, however, which would be substantial evidence and the government's burden, which was to prove that the petitioner abandoned her residence by clear, convincing and unequivocal evidence. It's essentially a factual inquiry. The question The government has the burden of proving by clear and convincing evidence, and that's what is required to persuade the I.J. Correct. Having gotten past that hurdle and having, since I.J. told us that that hurdle was met, because he the I.J. or she, I forget who it was, she was persuaded. Now we're on appeal, ask ourselves only the question whether the finding is supported by substantial evidence. The finding... We don't review clear and convincing proof, you know, things that have been proven by clear and convincing proof or by proof beyond a The standard on appeal is exactly the same in a criminal case as it is in a civil case, as it is in one of these in-between cases. The question is whether there's substantial evidence to support... A conclusion that clear and convincing evidence was presented that she, in fact, abandoned her residence. Well, this is... There's substantial evidence to support findings of a trial of fact. You might say... In criminal cases, we never say, oh, we review this differently because the burden of the government at trial was so much heavier. The question is always, is there enough evidence in the records to support the finding? Could a rational trial of fact so decide? Okay, well, assuming... Well, let's look at it under that standard. It is essentially a factual inquiry. And the most factually analogous case to this case that is in precedent is the Chavez-Ramirez case. And that's the case that set forth the standard whether a visit abroad is, in fact, temporary when it goes beyond what would be deemed short based upon the person showing that their... Or their stated intention was that their visit abroad would terminate upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period. In the Chavez-Ramirez case, the stated reason for traveling abroad was that the petitioner needed to care for an ailing relative. Similarly, in this case. But you agree that it's not... She says to herself subjectively, oh yeah, I plan to go back someday. Oh, it's clearly not that. And I think the BIA identified the issue and the legal rule clearly. I don't know that the government agrees that that is, based on their brief, the rule of the case. However... So what's the magic event here? Well, I think the magic event here, if there is one, is that this court called the Chavez-Ramirez case a close case. And... No, no, what's the magic event in her case? Her child... Someday... Okay, well, that her child would return to health. Her child was born with severe malignant birth defects. He had substantial reconstructive surgeries. I won't get into all the facts. In the United States. In the United States. In his recuperation, she was a... The petitioner was applying for Medicare benefits. For some reason, she didn't push through with the application or it was taking too long. She knew she could get medical care in Hong Kong because both she and her husband were residents and born... Or had been born in Hong Kong for five dollars a visit. So she went there. She... There's ample evidence of ongoing medical treatment in the certified record toward the end in the... For what? The child was being treated for gastroenteritis and rhinitis and various... Diarrhea. Various digestive tract ailments as well as rhinitis. Now, that might not sound so severe, but given his situation and the surgeries he underwent when he was born, I think it is substantial. And... And there is ample evidence. The BIA said Connie Fung failed to explain why he still needed treatment. Well, she... It's in the record. She presented medical documentation that he had been seeing these doctors in Hong Kong. It only cost her five dollars a visit. That's why she went there. She came back... Was she eligible for Medicare here? Well, she was applying. She wasn't rejected for lack of eligibility. Apparently, she failed to properly fill out a questionnaire. However... Why is it in the record that she could have had this here? And had she been qualified, which there's no evidence that she couldn't have qualified other than her... If you... Her abandoning the... The... The application, she would have had free or very cheap medical care here. Perhaps. She chose to be there with her family, which is not... Not... Well, perhaps... It's difficult to understand if you have a child. Perhaps, Your Honor. But also, perhaps the process was taking too long. It was unfamiliar to her. And she knew on that day, if she went to Hong Kong for five dollars a visit, this kid would be taken care of. But she had it before, right? Or did she? Did she have Medi-Cal before? No. There's... The record's not clear as to... What was paying for all of that? All of it. I assume because it was expedited basis. It's not in the record, but I can only make that assumption. Well, a lot of times you... It sounded like she was getting Medi-Cal. I gathered from what the record said, she didn't have private insurance. So she must have been getting insurance from somewhere. I mean, I know hospitals are really neat, but most of them want money. Correct. And again, it's not in the record, but I can only assume because these were serious, life-threatening deformities, that it was expedited basis. And the follow-up care, she... That's a problem here. It seems like she just didn't bother. Now, bother might be the wrong word. Maybe it was mysterious to her, although I think she was working as a clerk or something? She worked as a clerk at a bank here. In a bank. So she probably wasn't completely unfamiliar with dealing with paper. But anyway, it looked like she just never filled out the forms right, and that's what they told her. And their final rejection was she was already in Hong Kong by the time that came. She just sort of... Her final rejection came two months after she departed. And there were two letters, one in November of 95, and the second one came in January of 96. She had already gone. Let's assume she made the decision to go to Hong Kong. She did it because she knew... I mean, she neglected to follow through with the Medicare application. She went to Hong Kong because she knew she could get care for $25 for a child. And I think if you look at the overall factors that they look at... The ticket alone would pay for a lot of visits. You know, that doesn't sort of make sense to me. Well, it's certainly... Not so cheap. It's not cheap to fly to Asia, that's true, Your Honor, but that's not in the record, and she presented evidence... It doesn't sort of make sense. I mean, what I understand, what makes sense to me, is that if you have a sick child, you want to be with family. I mean, family provides support, both emotional support, and they can be there to watch the child and babysit, and cultural support. You know, there's all sorts of things like that. Right, but that does not mean she did not hold an uninterrupted intention of going to Hong Kong. It doesn't mean that. It's just what the I.J.'s looking at. But is it clear... For example, she's still here right now, right? Yes, she is. She's been here for how many years now with her child is lodged in Hong Kong with her husband and her family? She's been here since 98. So apparently, even if her child needed medical care in Hong Kong, she could have been in this country. Well, she attempted to come back more than once, and she experienced difficulties. The first time her child was... She came back once, and her child basically cleaned out her stuff. We came back for what looked like the purpose of closing up apartments and bank accounts, and basically cleaned out her stuff, and then leaves, and then doesn't come back for another two years. She was trying to buy a house and find a job is the reason she came back. And when she... She kept her things here. That's what she says, but what it looks like. I mean, if you look at the objective things that she does, she gets rid of just about everything she has here. It looks to me like sort of closing up shop and turning out the lights on your way out. And then two years later, for whatever reason, she just comes... Now, maybe we would construe things differently if we were trying to find... But the question is, you know, given sort of this gestalt, given all the things that are actual on the record, and using normal common sense, and giving deference to the entire fact, how is it possible to say this finding isn't supported by substantial evidence? Well, just one last point. When she was working in Hong Kong, she maintained her bank account here. All her paychecks were deposited here. She renewed her California driver's license in 1997. She maintained an automobile and insurance in California. She kept her belongings here. If she were to... If she were objectively viewed to be abandoning her resident status, why didn't she liquidate everything? She kept it at a friend's house. OK. There's nothing further. I thank you for your time. Good morning, Your Honors. This is Frances McLaughlin on behalf of the Attorney General, Sean Ashcroft. Substantial evidence does support the Board's conclusion that the government clearly and convincingly demonstrated that the close to two and a half years where Petitioner lived... You're not going to read your brief, are you? No. I'm going to give you my little intro, and then I'm going to address some points. Is there anything in your brief you think is not given you for today? Is there anything in your brief that you think wasn't adequately covered in your brief? I think I can... Yes. I think there's a couple of things that will actually assist the Court even more so, particularly when you look at the reason... the proffered reason why the Petitioner left the United States is that she wanted her son to meet his grandparents. She needed help caring for him after the three surgeries that he had here in the United States, and because she couldn't get health insurance in the United States. Under the Ninth Circuit's relevant inquiry, those are the occurrence of events. We're not sure when they're going to occur. They have to occur in a relatively short period of time. Well, she left in November of 1995. He met his grandparents. She didn't come back. They helped her to care for him during that time. She didn't come back. She didn't have health insurance in the United States. But did she make any efforts to try to get that health insurance in the United States? No. I think what's important here is to put this within the rubric of the Chavez-Ramirez paradigm. None of the reasons that she proffered for leaving meet the requisite level of definiteness, and they all lend actually in favor of that. It is certainly understandable that she wanted to go and live with her family while her son was recovering. I think it's important to focus on the medical treatment here. For instance, his last of the three surgeries occurred in June of 1995. She left five months later in November of 1995. With the three reasons I just iterated, let's focus on the second one, to get the help of her family in caring for this sick child. But then she returned five months later in April of 1996 for three weeks. She brought the child with her. He was okay to travel on the cross-country flight from Asia. An inference can be raised that he had sufficiently recovered with the help of his family. Indeed, when she was here for those three weeks, as Petitioner just argued to you, as is in the record, as is in the brief, her reason for coming back in its best possible light was to find employment and a place to live. The facts also indicate that it was in some ways a summing up, packing up the things she had here, leaving the apartment that she had been staying in and putting her stuff in a closet at a friend's house. But even if you take it in the light most favorable to her, which, as we've acknowledged, the standard of review does not require you to do, to find employment or a place to live, those do not have the requisite definiteness under the Chaveras-Ramirez rubric. And importantly, they don't relate to getting medical care for her child. She returned three weeks later to Hong Kong and stayed there for another two years. Of course, it's understandable if she could get medical treatment in Hong Kong to want medical care for her child at $5. That makes sense. Just because it makes sense doesn't mean that she has not maintained the factually specific, continuous, uninterrupted intention to stay a legal permanent resident in the United States. I think if you carefully look at the medical records in this case, they don't have anything to do with the three surgeries that he underwent, the last one being in 6 of 95. For instance, the first one that I could find after she went back in April of 96, I could find an emergency room visit in 97 where he was throwing up. I found another record about, I think, a year later in 98 where he was suffering from coughing. Understandable. But that she would want this medical care. But if the alleged reason was that to get medical care for her son after these three surgeries, here we are, the surgery took place in 11, excuse me, June of 95. Here we are in January of 98, and she's getting medical treatment for a cough. Nothing to do with the three surgeries having to do with the unfortunate circumstances with this child's reproductive organs. Ninth Circuit precedent is clear. I think this is in the Codigolian case from 2003, that when we're in prong B of the Chavez-Ramirez test and the occurrence of the event is something that we're not sure when it's going to occur, but it has to occur in a reasonable timeframe, once the event occurs, the person has to return back to the United States. I believe there is language directly to that effect in Codigolian. So here, once again, the law of this circuit demonstrates that the board's decision here should be affirmed. You have the specific contacts? You managed to confuse me. I thought I heard it straight, but you managed to confuse me now. Okay. Well, that's not my intent. How can I help? So she's over here, and she has a sick child. It's horrible surgeries. And she says, look, I have no intent to abandon America, you know. The land is free and home of the bold, and I definitely want to live here. But while I have a sick child, it would be very useful to have my family there for support. It would be nice if America would let them in, but we know they don't. I'm a permanent resident. I can't sponsor them to come in. And if they're going to help me with my sick child while he's still a child, and while he is sick, I'm going to have to go over there and spend time away. Now, I don't have any intent of leaving the United States. And as soon as the child is better and old enough where the sort of psychological and material support that I can get for my family is no longer necessary, I'm going to come back maybe in a year or two or three. But while I have a baby that's horribly sick, I'm going over there to get the support. Now, what's wrong with that scenario, now that you've sort of focused my attention on it? It sounds to me like what you're really saying is that the IJS findings are not supported by substantial evidence. No, Your Honor, not at all. They're actually quite supported by substantial evidence when you look at- That's what I thought when Natalie and I got talking, but now you've managed to confuse me. I'm not sure what I might have said that was inconsistent with that. I think it actually- Isn't this an extraordinary event? I mean, it's not like you're talking about a sick child like a cough. But the way this child, who is a U.S. citizen, started life was extraordinary, and the kind of difficulties the child would face having started like that, and what she described when she came back from three weeks in terms of screaming all night and the neighbors complaining, it's not hard for me to visualize a young woman saying, I just can't cope in his infancy while he's going through that. I need more help. This is where I want to live, but for the time being, I need some help, and so for the next couple years while he's an infant, I'm going to have to go get the help. What's implausible about that story? I don't think it's implausible at all, but does it satisfy the test for whether or not her two-year trip to Hong Kong was only a temporary visit abroad? No, it does not. It's certainly a plausible reason. No one doubts her credibility. A temporary visit can be for three years or four years. If there's an event that's likely going to happen at some reasonable time, then you come back when the event's over. You know, a kid grows up. You know, you don't need quite as much help from the family. The problems he had when he was born are now ameliorated. That's the event. You don't know exactly when this will happen, just like life itself. That's correct, but I think there's not evidence in the record that, you know, in the event of him getting better, the actual medical evidence shows that he did get better, and she still did not come back. But that's not the test. The question is not whether she, in fact, follows through with her intention. The question is whether, when she leaves, she has an intent to abandon. I mean, let's say she says, look, I'm going to come back just as soon as my baby is better, and then she gets over there, and the baby gets better, but then, you know, there's a problem with family, you know, mom is sick or whatever, and she says, I can't leave right the minute he gets better, and she changes her mind. She says, well, I'm still going back, but now I've got this other thing that's keeping me here, and I'll, you know, later state of mind doesn't matter. The question is, did she leave here abandoned? Why would she have left her apartment? Why would she have left her, kept paying insurance on a minivan? Why would she have kept her things in storage if she was planning to abandon? You'd think she would have sold them on eBay. I think, once again, it's a fact-specific inquiry as to whether she maintained the, of course, she says she maintained the intent, but the case law is clear that you look instances. I mean, keeping things in storage, when you look at this circuit's precedent and the precedent of the BIA, that's a far cry from other cases where the board and the courts have still found that that, those types of minimal contacts in the United States don't demonstrate this is only a temporary visit abroad. For instance, I see my time is out. Just, you know, they had a, they owned investment property, they owned a home, and still that wasn't considered, you know, a requisite contact. I think what the IJ did, excuse me, what the board did here was look at the evidence piece by piece and decide that it demonstrated that this did not constitute merely a temporary visit abroad, that she was living over there with her family. And I think, importantly, as you noted at the outset when opposing counsel was arguing, is that the record does not compel a conclusion different than that reached by the board. That's what I thought when he was talking. You managed to make it close. Well, I regret that. I gave you a chance. But we'll have to figure it out based on this confusion. Cases are you will stand submitted.
judges: Kozinski, Fernandez, Clifton